In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00048-CR
_____

**GERALD GLENN NUGENT JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 253rd District Court**
**Liberty County, Texas**
**Trial Cause No. CR28370**

**MEMORANDUM OPINION**

The trial court found Gerald Glenn Nugent Jr. guilty of murder, and sentenced him to sixty years in prison. Nugent maintains that his jury waiver was invalid, and that the evidence is insufficient to support the conviction.

THE EVIDENCE

Brook was the daughter of Gerald Nugent and Martina Sellers. On October 20, 2005, Sellers arrived at Cleveland Regional Medical Center with seven-week-old Brook. A registration clerk saw Sellers holding Brook in the lobby. Sellers was

1

upset. The clerk noticed bruising on Brook's forehead and neck. Brook stiffened in the clerk's arms, and was not focusing or visibly breathing. The clerk called the nurse. The nurse came immediately and took Brook to a room.

Lisa Paxton, a nurse at Cleveland Regional, testified that she first had contact with Brook in the emergency room. Brook was very pale, her arms were rigid and down by her sides, her legs were stiff, her eyes were deviated to the left and not focusing, and her body was jerking. She was seizing and her breathing was labored. Paxton described Brook's injuries as life-threatening.

Paxton observed bruising under Brook's chin and on her forehead. When Paxton removed Brook's clothes, Brook had obvious bruising to her chest and abdomen. Paxton testified Sellers denied knowing the bruises were there. Sellers said that she had been at work and that she did not know what had happened, and that maybe her other child had picked the baby up out of the swing or dropped a toy on her. When Sellers went to work, she left Brook with Brook's father.

Dr. Paul Allencherril, a physician in internal medicine, testified that he was working in the emergency room at Cleveland Regional. Allencherril described Brook as being limp and in respiratory distress. The medical staff intubated Brook and stabilized her. She was administered multiple doses of medicine to control seizures. Her hemoglobin was extremely low, which indicated she had sustained

blood loss. Allencherril indicated that Brook tested positive for marijuana and tricyclic antidepressant.

A CAT scan showed that Brook had sustained blunt-force injury to the head, multiple skull fractures, and multiple areas of bleeding inside the brain. Allencherril noted there were bruises on Brook that would have indicated grabbing with excessive force. The skull injuries were consistent with "strong hands, against a wall, on the floor." Allencherril described the force necessary to cause the skull injuries as "[c]onsiderable force," and he agreed that the force necessary to cause those injuries would be a force that the actor would know would result in serious injuries to the child. Allencherril testified the injuries were life-threatening. He described her condition as being the result of "inflicted" injuries and "non-accidental trauma." The hospital did not do further tests or x-rays to determine whether Brook had any healing injuries, because of the necessity to stabilize and transfer her for further treatment.

Brook was transferred to Texas Children's Hospital in Houston for a higher level of care. Dr. Jeanine Graf, a pediatric intensive care physician at Texas Children's, testified that Brook's condition upon arrival was life-threatening. Brook's care team was concerned that Brook would die. The staff at the hospital considered taking Brook off life-support.

Brook's head injuries were caused by "a severe degree of blunt force . . . [similar] to a motor vehicle accident where a child or an adult is thrown head first into a windshield" which "may have been combined with a shaking injury." Graf testified that Brook's head injuries could not "have been going on for hours or days[,]" that Brook would have immediately been symptomatic, and that the severity of her injuries would have been "readily apparent to any lay observer or any medical personnel" because Brook would not have been breathing normally and would have changed color.

In addition to a parietal skull fracture, bleeding within the skull, and retinal hemorrhages, Brook also had evidence of old healing fractures of the ninth and tenth ribs, her left big toe, and left distal femur. Graf explained that Brook's injuries were non-accidental and that the rib fractures were consistent with a squeezing injury. Graf stated that there were new and old injuries. Brook was abused on at least two occasions. Brook also had external bruising that did not "necessarily correlate" with her fractures. Graf and Allencherril testified that Brook's injuries were not consistent with the account of a child being held in a person's arms and the striking of the child's head on a door frame without even a cry from the child. Neither were the injuries consistent with those allegedly arising from the activity of the children jumping on a bed while Brook was lying on the

4

bed, from Brook's being tossed across a bed and rolling down on the floor, or with a person's holding Brook and dropping her.

Brook was discharged from Texas Children's in November 2005 and went into foster care. She was able to breathe on her own but required a feeding tube. She required medication to control her seizures. Graf believed Brook's condition would not improve. Graf did not know how long Brook would live.

Two foster mothers who cared for Brook at different times testified regarding the specialized care provided to Brook in their homes. Brook required twenty-four-hour-a-day care, and never improved. Brook could not talk, walk, reach for anything, roll completely over, or sit up independently.

Brook had a feeding button implanted in her stomach and had surgery at Texas Children's for her severe reflux. The foster mother caring for Brook at the time thought Brook was improving after the surgery, but Brook died November 23, 2007. The foster mother found Brook unresponsive in her crib and called the authorities.

Dr. Kathryn Haden-Pinneri, a forensic pathologist, testified that she reviewed Brook's medical records and performed the autopsy on Brook. Haden-Pinneri stated that at the time of the autopsy Brook showed no sign of recent injuries. The toxicology screening presented normal results and a check of Brook's

5

electrolytes showed she was not dehydrated. Haden-Pinneri explained that in the weeks prior to Brook's death Brook had experienced complications such as not tolerating the feeding tubes, and she had developed a urinary tract infection. Since her release from the hospital in 2005, Brook was in a persistent vegetative state and could have died from complications at any time. Haden-Pinneri testified that in her opinion Brook's death was due to complications of remote, non-accidental, blunt head trauma that she suffered on October 20, 2005. Brook had undergone a "jejunostomy tube replacement, which is a feeding tube that goes from the outside of the body into the intestines" approximately two weeks prior to her death. The pathologist saw no evidence that the surgery contributed to the cause of death.

Stacey Greke, a child abuse investigator for CPS, went to Cleveland Regional early on the morning of October 21st. She spoke with hospital personnel, took photographs of Brook, and interviewed Brook's parents. Greke testified that when she first began questioning Nugent, he initially appeared "flippant," but then became more serious as the interview progressed. Greke asked Nugent what had happened to Brook. Nugent at first said, "I don't know. You tell me." He subsequently told Greke that around 10 p.m. on October 19th he was reaching up into a closet to grab a diaper and had bumped Brook's head against the door frame. He said that her head was partly protected by how he was holding her in his arm,

6

that it was not a strong use of force, and that she did not cry. She did not appear hurt until the evening of the 20th while Sellers was at work. Brook became listless and turned pale.

Nugent did not tell Greke that Brook was symptomatic prior to the time Sellers left for work. Nugent told Greke he had no knowledge of the source of the bruising on Brook's neck and stomach, but told her the bruising might have been caused by the way he burped her. He denied drug or alcohol abuse.

Sellers told Greke that she did not know what happened to Brook. She had been at work when Nugent called her, and she only knew what Nugent told her. Sellers told Greke she had never seen any bruises on Brook.

Gary Martin, a detective with the Liberty Police Department, went to Cleveland Regional Medical Center on the morning of October 21, 2005. He saw Brook. Paxton and Allencherril explained Brook's condition. Martin was informed that Brook was in critical condition and that they were trying to stabilize her for transport to Texas Children's Hospital in Houston. Martin spoke with Sellers and her mother. Nugent also spoke to Martin alone.

Martin asked Nugent if he knew the source of Brook's bruises. Nugent told him that the bruise on Brook's forehead occurred on October 18th when Nugent accidentally bumped Brook's head into the door frame as he was getting a diaper.

7

He said that Brook did not cry and seemed to be fine. He called Sellers to let her know what happened and let her know that there did not appear to be any injury. Nugent told Martin he had not noticed any of the other bruises.

Nugent said that on October 20th he and his two sons had gone to the laundromat for approximately five hours to do laundry. Sellers was home with Brook. Nugent and his sons came home from doing the laundry around 3:30 p.m., and Sellers left around 3:45 p.m. for work.

Nugent was Brook's caregiver while Sellers was at work. The only other people at the home while Sellers was at work were Nugent's three-year-old and five-year-old sons. After Sellers left, Brook slept for some time. Nugent woke her up to feed her. Brook would not take her formula, and seemed groggy, tired, and fussy. Nugent held Brook and watched television while he tried to feed her. Nugent told Martin that around 7 p.m. he noticed Brook turning pale, and her lips turning a pinkish color. He said he called Sellers and asked if she could come home because Brook was sick. Nugent told Martin that Sellers told Nugent to give Brook a bath and that she would be home shortly. Sellers took Brook to the hospital when she got home from work.

Later on October 21st, Martin and Police Chief Bill Griffin went to Texas Children's Hospital. At Texas Children's Hospital, Nugent again voluntarily talked

8

to Martin and Griffin. Nugent offered more details. The audio recording of the interview was played at trial.

During the recorded interview at Texas Children's Hospital, Nugent indicated that while he was caring for Brook around October 13th, he left Brook on a bed with his son and stepson. He heard her screaming. The boys had been jumping on the bed. Nugent stated that after that Brook did not act normal and was grunting and was tired all the time. Nugent explained that on October 19th around 10 p.m. he accidentally hit Brook's head on the closet door frame. According to Nugent's recorded statement, Brook's symptoms on the morning of October 20th were the same as for the preceding week. Brook began showing new symptoms at about 6 p.m. on October 20. At 7:45 p.m. Nugent called Sellers at work. Brook had difficulty breathing, was spitting her food out, and moving slower. Her lips changed color.

John Bickel was the clinical social worker in the emergency department at Texas Children's Hospital when Brook arrived. Bickel interviewed Nugent and Sellers. Neither parent admitted causing Brook's injuries or gave an explanation of what caused her injuries. Nugent told Bickel that he became concerned after he changed and fed her around noon, because he had left Brook on the bed, and her siblings were on the bed. He heard Brook crying and he returned to the bedroom.

She started to shut her eyes, and when he tried to feed her she kept spitting up. Nugent said that after Sellers left for work, Brook began grunting, her lips were turning pink, and she was moving her arms like she was swimming. She fell asleep. Around 6 p.m. Nugent had difficulty waking her, and he called Sellers at work and told her to come home. Nugent told Bickel that he and Sellers thought that Brook was dehydrated like before when she was diagnosed with "reflux." Nugent told Bickel that Sellers arrived home around 8:45 p.m. Nugent told her to take Brook to the hospital while he stayed home with Brook's siblings.

Sellers reported that she noted a difference in Brook's crying during her 10 a.m. feeding prior to Sellers' leaving for work at 3:15 p.m. She reported that at 7:30 p.m. Nugent called her and she came home at 10 p.m. She then took Brook to the hospital. At a meeting on October 24th when medical staff explained the amount of force necessary to cause Brook's injuries, Brook's parents expressed a concern that a baby-sitter a few weeks prior might have caused the injuries.

Martin spoke with Sellers at Cleveland Regional, and again at Texas Children's Hospital on October 21, but she declined to give Martin any further interviews. Sellers could not explain Brook's injuries but told Martin that Nugent had told her that one of the boys possibly hit Brook in the head with a toy. She also told Martin that Nugent had told her he had accidentally hit Brook's head on a door

10

frame. Even though Sellers was the one who said she always bathed Brook, Sellers told Martin that she had never noticed any bruises on the child. Neither Sellers nor Nugent ever attempted to call 9-1-1 regarding Brook's condition.

According to Martin, after Sellers heard about the seriousness of Brook's injuries, Seller's demeanor at the hospital was non-responsive and sometimes appeared "uncaring." Martin observed Nugent to have a similar demeanor that day.

Jonathan Sellers, Sellers' son from her prior marriage, testified to what he remembered had happened at the apartment the day Brook was taken to the hospital. He said he would have been about five years old. He remembers that his mother went to work that night. Jonathan recalled seeing Nugent rock Brook and change her diaper that night, but he did not remember Nugent ever trying to feed her, though Sellers had left a bottle on the counter before she left. Jonathan was in his room playing and he heard Brook crying in the living room. He walked into the hallway and saw Nugent sitting on the floor holding Brook in front of him. Jonathan said Nugent was holding her around the chest area and was being "mean." Jonathan yelled at Nugent "over and over" to stop because Jonathan did not want Nugent to hold Brook like that. Jonathan testified Nugent was hurting Brook and that Nugent did not say anything to Jonathan or stop what he was doing after Jonathan told him to stop. This incident was the only occasion Jonathan had

11

seen Nugent be mean to Brook. Jonathan indicated he had never seen his mother or brother or anyone else be mean to Brook. When his mother got home from work that evening, she looked "sad" and took Brook to the hospital while the two boys and Nugent stayed at the apartment. Jonathan stated that since that night he has talked with his mother about it "a couple of times" and also talked to his grandparents.

Jacob Nugent, Sellers' and Nugent's son, also testified. He was nine years old at the time of trial. He stated his dad was never mean to him or his brother Jonathan. He remembered his mother being mean to Brook two times: one time when she was shouting at Brook and one time when he saw her throw Brook against the wall. He testified that when he was eight he told a lady talking to him at Bridgehaven that his dad told him his mother had slammed Brook into the wall.

Angelia Cabrera testified she worked alongside Sellers at a Mexican restaurant in Liberty on the evening of October 20, 2005. Sellers came to work that evening and at some point said that her baby was sick. Cabrera later took a phone call from Nugent who was calling to talk with Sellers. Cabrera did not overhear the conversation or know whether Sellers had talked to Nugent earlier, because Sellers also answered the phone at the restaurant. Cabrera asked Sellers if she needed to go home, but she said no. Sellers and Cabrera left work between 9:30 p.m. and 10

p.m. The call from Nugent that Cabrera answered was thirty minutes to an hour before she and Sellers left the restaurant.

Various statements by Nugent were admitted into evidence. In the statements, Nugent gave differing time frames for when Brook was symptomatic, when Nugent called Sellers at work, and when Sellers came home from work. Martin stated that whenever Nugent voluntarily came in after October 21st to give more details concerning what had happened, he would make a point of saying things to make Sellers look bad.

In one statement, Nugent explained that the week prior, he laid Brook on the bed in the apartment, left the room, and heard her scream. The boys had been jumping on the bed. He indicated he did not notice the other bruising, but he said that the bruise on her head was from hitting it on the closet door frame. In another statement, Nugent explained that Sellers kept coming up with excuses for how Brook was injured: perhaps Sellers had a seizure and dropped Brook but did not remember it; maybe Brook had brittle bone disease; or perhaps Brook had some problems stemming from her birth. Nugent indicated Sellers abused prescription pills, and he believed Sellers lost her temper and shook Brook.

In a different statement, Nugent told law enforcement that he had not been honest in his prior statements because he was protecting Sellers. He wanted her to

get mental help and not go to prison, and he was scared she would take the children from him. Nugent said what actually happened was that when he came home from the laundromat, he walked up the stairs to their apartment, found the door locked, and heard Brook crying. When he quietly opened the door, he saw Sellers just as she was lifting her hand off Brook's chest. Sellers was sweating. It looked like Sellers had just hit Brook, and then he heard Brook whimper. He also stated that when he and Sellers were alone in the apartment one evening after coming home from Texas Children's, Sellers admitted to him that she did not mean to do it, but Brook would not stop crying, and she threw Brook against the wall. Nugent's grand jury testimony from December 2005 and his CPS deposition taken May 11, 2006, were also admitted into evidence.

Nugent testified at trial. He did not recall seeing any bruises on Brook on October 19, 2005. He had no explanation for the testimony that Brook had healing fractures prior to October 19, 2005, and he denied causing any injuries to Brook on or prior to October 19, 2005, that would have caused a break or fracture of the ribs, foot, or femur. He admitted taking Vicodin for "recreational" purposes and drinking alcohol in October 2005.

Nugent explained that on the morning of October 20, 2005, he left around 10 a.m. to go to the laundromat. Nothing out of the ordinary happened that morning.

14

Brook was "a little fussy, hungry." Nugent came back to the apartment around 4 p.m. He saw Sellers tapping on Brook's chest. He admitted that he had exaggerated in prior statements when he said she had hit Brook. Sellers told him that Jonathan had aggravated her all day, and Brook was "real fussy" and had slept most of the day. Nugent agreed that when he was confronted in November and December of 2005 about Brook's injuries, he exaggerated in at least one of his statements and tried to make it look like Sellers was being secretive by saying she had locked the door.

After Sellers left for work, Nugent checked on Brook and she was sleeping. At some point he tried to feed Brook. She would not eat. Brook was making a swimming motion and she was not interacting like she normally would, so Nugent called Sellers at work. He thought Brook might be reacting to her medicine and asked Sellers if she had given Brook her medicine. He called Sellers later that evening and said she needed to come home. He thought Brook needed to go to the doctor. He did not call 911 because he did not think it was that serious: Brook was acting like she had in the prior weeks when she was suffering from reflux.

Nugent agreed that he called Sellers at 8:18 p.m. at work and described Brook's symptoms as not just fussy: she had labored breathing, pale coloration, and lips changing color. Sellers told him to give Brook a bath and see if that would

15

help. Nugent did not bathe her. Phone records show an incoming call at 8:31 p.m., and Nugent agreed that it could have been Sellers calling back to check on Brook. Nugent explained that Sellers came home later and was in the apartment for about ten minutes before leaving with Brook around 10 p.m. for the hospital. Nugent stayed at the apartment with the boys.

Nugent admitted to smoking three joints of marijuana on October 19, 2005, but denied using Vicodin on October 19, 2005, or October 20, 2005. He stated that while he was waiting for the laundry to finish on October 20, 2005, he got a six pack of beer from the store and drank four of the beers before going home.

At trial, Nugent denied causing any of Brook's injuries. He could not give an explanation for her injuries but said that Sellers did it. Nugent admitted to lying in all eleven of his statements to different individuals in the case. Nugent stated that he and Sellers both lied separately throughout the investigation. He testified he lied to law enforcement officers when he told them that Sellers told him she threw Brook against the wall. He never confronted Sellers about why Brook had antidepressant medication in her system on October 20, 2005. He knew Sellers took a prescribed antidepressant. He admitted that the only explanation Sellers gave him for what could have happened to Brook was that she did not know.

16

## WAIVER OF RIGHT TO A JURY TRIAL

In his first issue, Nugent argues that although there is a written waiver of jury trial in the record, "nowhere in the record does it show that [he] executed the waiver in person in open court." The clerk's record demonstrates Nugent executed a written waiver of jury trial, and a supplemental reporter's record demonstrates Nugent presented the written waiver in open court. The trial court approved the written waiver of a jury trial after Nugent testified that he read and understood the written waiver and the charges against him, and that he was waiving his constitutional right to a jury trial. Issue one is overruled.

## SUFFICIENCY OF THE EVIDENCE

In his second issue, Nugent contends the evidence is insufficient to support his conviction. The *Jackson v. Virginia* legal-sufficiency standard applies. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). As a reviewing court, we must defer to the trier of fact on the resolution of conflicting testimony, the weight to be given the evidence, and the reasonable inferences drawn from the testimony. *Jackson*, 443 U.S. at 318-19. A person commits murder if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act

17

clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(3) (West 2011). Nugent argues that the evidence showed he was not the only adult to have access to his daughter in the twelve hours prior to Brook's admission to the hospital. He also asserts that surgery on Brook was an intervening cause that resulted in her death.

Medical professionals in this case testified that none of the explanations posed by Nugent and Sellers were consistent with Brook's injuries. The medical professionals stated that Brook suffered a blunt-force injury to her head. They testified that Brook would have been symptomatic immediately or "very soon" after suffering the blunt force trauma to her head. Nugent reported Brook's symptoms to Sellers while Brook was in his care. At one point, he admitted to causing the bruise on Brook's head but claimed it was an accident. Jonathan testified he saw Nugent hurting Brook that night after Sellers left for work. Nugent admitted he lied in all the statements he gave in the case, and many of his statements were admitted into evidence. He admitted he lied when he told law enforcement that Sellers had confessed to throwing Brook against the wall. Although Haden-Pinneri explained that Brook had undergone surgery weeks before her death, Haden-Pinneri stated that the surgery was not a contributing factor in Brook's death. No other evidence suggested that the surgery was an

18

intervening cause that contributed to her death. A fact finder could rationally find beyond a reasonable doubt that appellant murdered Brook. The evidence is sufficient to support the conviction. Issue two is overruled.

The trial court's judgment is affirmed.

AFFIRMED.

_____
DAVID GAULTNEY
Justice

Submitted on June 18, 2013
Opinion Delivered September 4, 2013
Do Not Publish

Before Gaultney, Kreger, and Horton, JJ.

19